IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOUGLAS ROBERTS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 14 C 6081 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Douglas Roberts, asks the Court to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 14: Pl.'s Motion for SJ). The Commissioner has filed a motion seeking affirmance of the decision (doc. # 16: Comm'r.'s Motion for SJ). For the following reasons, we grant plaintiff's motion, deny the Commissioner's motion, and remand the case for further consideration.

I.

On January 11, 2012, Mr. Roberts applied for SSI and DIB, alleging an onset date of June 15, 2011 (R. 22). Mr. Robert's claim was denied initially on June 22, 2012 (R. 84) and upon reconsideration on February 6, 2013 (R. 95). He participated in a hearing on October 8, 2013 before Administrative Law Judge Linda Halperin ("ALJ") (R. 34). A vocational expert ("VE") and two medical experts ("ME"s) also appeared and testified at the hearing. On December 6, 2013, the ALJ issued a decision finding that Mr. Roberts was not disabled and denying his claim

---

[1]On September 24, 2014, by consent of the parties (doc. # 6) and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

for benefits (R. 22-27). On June 3, 2014, the Appeals Council denied Mr. Roberts' request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-4). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

**II.**

Mr. Roberts alleges a disability onset date of June 15, 2011, when he was 47 years old (R. 158). He did not experience a particular medical event on that date, and the record is silent about his reason for selecting that date as the onset of his disability.[2] The bases for Mr. Roberts' allegation of disability are: (1) left eye blindness as a result of a 2009 central retinal vein occlusion (CRVO);[3] (2) recurrent pain and headaches due to glaucoma in his left eye; (3) asthma; (4) back pain; and (5) depression and anxiety (doc. # 15: Pl.'s Mem. in Support of Mot. for SJ at 2-6).

In her opinion of December 6, 2013, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required her to analyze whether Mr. Roberts: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). After determining that

---

[2] In her opinion, the ALJ noted that Mr. Roberts participated in an earlier hearing regarding a claim for benefits, which was denied because Mr. Roberts had earnings after his alleged onset date that exceeded $15,000 (R. 24). The record does not contain this prior opinion. Although not mentioned by the ALJ, the record contains a short letter from Mr. Roberts' former employer which states that he was laid off on June 25, 2011 (two weeks after he alleges an onset of disability) because of lack of work and no other reason; the letter says that Mr. Roberts' performance was satisfactory up until his layoff (R. 228). According to records generated by the Commission, Mr. Roberts earned a total of $17,989.39 between January and July 2011; he had no earnings in the second half of 2011 or any time thereafter (R. 177, 183).

[3] A CRVO is a blockage of the main vein in the retina; it is colloquially known as a "stroke" in the eye. http://www.aao.org/eye-health/diseases/what-is-central-retinal-vein-occlusion, visited on February 3, 2016. Mr. Roberts' primary physician, Charles Welford, M.D., opined that Mr. Roberts' CRVO resulted from his abuse of cocaine, with alcohol, hypertension and hyperlipidemia being possible contributing factors (R. 344).

2

Mr. Roberts has not worked since his alleged onset date, at Step Two, the ALJ found that Mr. Roberts' only severe impairment was left eye blindness due to his CRVO (R. 24). The ALJ found that Mr. Roberts' other complaints – asthma, hypertension, arthralgia,[4] depression and anxiety – were not severe (*Id.*). In making her findings of non-severity, the ALJ discussed a number of medical records that suggested Mr. Roberts' impairments were generally mild and had improved over time, up to October 2013, when the medical record ended. Because the ALJ's analysis of the severity of Mr. Roberts' impairments is relevant to her assignment of Mr. Roberts' residual functional capacity ("RFC"), we describe her findings here.

## A.

With respect to Mr. Roberts' asthma, the ALJ pointed to medical records suggesting that Mr. Roberts' overuse of inhalant medication exacerbated, rather than reduced, the severity of his condition, and might also exacerbate his hypertension (R. 24, 344). The ALJ discussed pulmonary function tests in March and April 2010 that showed some restricted ventilatory impairment, which improved after a nebulizer treatment and which also showed improvement over tests conducted a year earlier (R. 24, 392-99, 640-45). The ALJ noted that although the most recent treatment notes from August 2013 diagnosed cardiopulmonary disease, Mr. Roberts' oxygen saturation at the time was 94 to 95 percent; and, while he experienced some wheezing, Mr. Roberts felt better after a nebulizer treatment, and his oxygen saturation had improved to 98 percent by September 2013 with no wheezing (R. 24, 614, 616).

The ALJ also discussed Mr. Roberts' hypertension and obesity, noting that while his blood pressure fluctuated at various appointments between normal and elevated readings, Mr. Roberts had no cardiac abnormalities or complications due to hypertension (R. 24). Further, no

---

[4] Arthralgia is another term for joint pain which, in this case, refers to alleged pain in Mr. Roberts' back. https://www.nlm.nih.gov/medlineplus/ency/article/003261.htm (last visited on January 29, 2016).

3

medical records mention Mr. Roberts' weight as a factor exacerbating any of his impairments and he was never instructed to lose weight. With respect to Mr. Roberts' allegations of back pain, the ALJ discussed that Mr. Roberts had sought treatment off and on for pain, noting that in September 2013, his treating physician described the pain as "waxing and waning" (R. 24 and 637). Mr. Roberts has not undergone any diagnostic tests (x-ray, MRI, etc.) with respect to his back pain and the ALJ found no evidence of severe musculoskeletal impairment (*Id.*).

Finally, the ALJ discussed Mr. Roberts' complaints of depression and anxiety and the scant medical evidence about his condition or treatment. The ALJ noted that the record contained a "depression and anxiety questionnaire" dated October 8, 2013 (the same day as the hearing), which assessed Mr. Roberts – via "check boxes" – as suffering from listing level depression and anxiety according to both the diagnostic, or "A" criteria and functional, or "B" criteria (R. 24, 652-55). The ALJ explained that the document had an illegible signature and was not accompanied by any treatment notes, narrative discussion, or other documentation to support the assessment. In contrast, the ALJ pointed to several medical records that contradicted the questionnaire[5] and explained that as a result, she called for an impartial medical expert to testify at the hearing to help reconcile the disparate opinions.

That expert, psychologist Michael Kearney, explained that Mr. Roberts had received no mental health therapy and his treatment was limited to taking various prescription medications on and off throughout the years (R. 24, 61). Dr. Kearney described Mr. Roberts' lack of significant mental health issues throughout the claims period and pointed out that Mr. Roberts'

---

[5]Other than the October 2013 mental health questionnaire, the entirety of the medical record relating to Mr. Roberts' mental health is a consultative psychiatric evaluation in October 2009 which diagnosed only mild adjustment disorder as a result of Mr. Roberts' CRVO; notes that Mr. Roberts' mood and affect were normal at various medical appointments for other impairments; and a psychological consultative examination in December 2012 which diagnosed Mr. Roberts with a mild anxiety disorder (R. 361-63, 614, 639, 422, 542-45, 557-559).

4

mood and affect were judged normal at the majority of his medical appointments for other ailments as well as the fact that in December 2012, he was diagnosed with a mild anxiety disorder and judged to have an accompanying "GAF" score of 67 (*Id.*).[6]

Based on Dr. Kearney's testimony, the ALJ gave no weight to the October 8, 2013 questionnaire because it was accompanied by no treatment records or supporting documentation and also because it was at odds with the remaining mental health evidence in the record (R. 25). Further, the ALJ noted that the little evidence that did exist about Mr. Roberts' mental health was in the form of consulting examinations and treating source observations and was all consistent with Dr. Kearney's assessment that Mr. Roberts' had only a mild anxiety disorder (*Id.*).

**B.**

After reviewing the medical evidence, at Step Three the ALJ found that Mr. Roberts' loss of vision in his left eye did not rise to the level of severity of a listed impairment because the vision in his remaining eye was not affected and he retained full visual acuity, full visual field and full visual efficiency in that eye (R. 25). The ALJ also noted that Mr. Roberts could and did drive (he drove to the hearing), and there was no other evidence indicating that his vision loss equaled a listing in severity (*Id.*).

The ALJ then assigned Mr. Roberts an RFC for sedentary work with environmental limitations due to his vision loss (R. 25). Specifically, the RFC stated that Mr. Roberts could not be exposed to heights, hazards, or moving machinery, and must avoid anything more than slight

---

[6]The Global Assessment of Functioning ("GAF") score measures patient functioning for all psychiatric disorders. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/, visited on February 1, 2016. A GAF score of 67 correlates with some mild psychiatric symptoms (such as mild anxiety) but a general ability to function fairly well in all aspects of ordinary living. DSM-IV-TR at 34. We do note that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

exposure to elevated humidity or airborne pollutants such as dust (*Id.*). The ALJ determined that Mr. Roberts' allegations of pain were credible with respect to complaints about his left eye, but not with respect to his back pain because of the lack of medical evidence of treatment for back pain in the medical record (*Id.*). With respect to Mr. Roberts' allegations about the intensity, persistence and limiting effects of his symptoms as a whole, the ALJ found they were not entirely credible for the reasons stated elsewhere in the decision (*Id.*). Further, the ALJ agreed with psychiatrist Gerald Hoffman, who Mr. Roberts saw soon after his CVRO in 2009, that Mr. Roberts' mental health issues were a reaction to his loss of vision and not a true mental impairment, and thus, did not contribute to any work-related limitations (*Id.*, R. 361-63).[7]

At Step Four, the ALJ held that Mr. Roberts was unable to perform his past relevant work as a truck driver, paint mixer, or highway maintenance worker because those jobs were medium exertion, semi-skilled positions (R. 26). However, at Step Five, the ALJ used the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 (the "Grid")[8] to determine whether there existed other jobs in the national economy that Mr. Roberts could perform, given his RFC. The ALJ first explained that if Mr. Roberts had been capable of performing a full range of sedentary jobs, Grid Rule 201.21 would direct a finding that he was not disabled (R. 27).[9] But because of the environmental limitations in Mr. Roberts' RFC, the ALJ explained that she used

---

[7] In assigning an RFC to Mr. Roberts, the ALJ did not mention the only RFC opinion in the record, performed in February 2013 by a Commission examiner. This RFC opined that Mr. Roberts could lift 20 pounds occasionally, 10 pounds frequently, stand/sit/walk for at least 6 hours in an 8 hour day, and prohibited all but occasional ladder or scaffold climbing (R. 567-74). While that RFC recognized that Mr. Roberts has vision in only one eye, it imposed no visual limitations on Mr. Roberts, apparently based on normal vision in his right eye (*Id.*).

[8] The Grid rules combine a claimant's age, education and work experience with his or her RFC to determine whether he or she is capable of performing substantial gainful activity at some level of exertion. https://www.ssa.gov/OP_Home/cfr20/404/404-app-p02.htm, visited on February 3, 2016

[9] Grid Rule 201.21 applies to high school graduates between the ages of 45 and 49 whose non-transferable previous work was either skilled or semi-skilled. If an individual with such a profile is able to perform the full range of sedentary work, he or she is not disabled. https://www.ssa.gov/OP_Home/cfr20/404/404-app-p02.htm visited on February 10, 2016.

the Grid as a framework for decision making pursuant to SSRs 83-12 and 83-14,[10] and considered hearing testimony from a VE about whether jobs exist in the national economy for an individual with Mr. Roberts' specific vocational profile (R. 27).

At the hearing, the ALJ provided the VE with a hypothetical question asking what jobs would be available for an individual who was 49 years old, blind in one eye, able to lift 10 to 15 pounds and sit, stand or walk for an hour (R. 63-64). In response, the VE stated that in determining if there were available jobs Mr. Roberts could perform, she reduced the number of sedentary jobs by thirty percent to account for those jobs that required full depth perception (R. 64-65). She then gave examples of three jobs, with their Dictionary of Occupational Titles ("DOT") reference numbers, that would be available to Mr. Roberts – table worker (for attaching felt-backed linoleum squares) (DOT 739.687-182), polisher (of eyeglass frames) (DOT 713.684-038) and document preparer (microfilm) (DOT 249.587-018) (R. 65). The ALJ did not include in the hypothetical any of Mr. Roberts' non-exertional limitations that she ultimately included in her RFC determination; thus, the VE did not consider these non-exertional limitations when testifying about the types and number of jobs available to Mr. Roberts.

In addition, the VE testified that nearly all sedentary jobs required near visual acuity, and thus, a claimant who did not have adequate near visual acuity would be precluded from performing any sedentary jobs (R. 68-69). An ME then testified that the medical records showed that with correction, Mr. Roberts had near perfect near visual acuity (20/20 vision) in his right eye, but no visual acuity in his left eye (R. 73-74). The ALJ did not ask, and the VE did not

---

[10]In cases where a claimant has non-exertional limitations that impose additional restrictions on the types of jobs he or she may pursue, an ALJ may not rely solely on the Grid to determine disability. *Haynes v. Barnhart*, 416 F.3d 621, 628-29 (7th Cir. 2005). SSRs 83-12 and 83-14 describe how an ALJ is to determine whether or not a claimant is disabled when he or she has a combination of both exertional and non-exertional limitations or when an individual's RFC does not fit into one specific exertional category.

testify, about whether the sedentary jobs she listed as available for Mr. Roberts required near visual acuity in both eyes or if near visual acuity in one eye was sufficient.

The ALJ concluded her opinion by noting that Mr. Roberts' attorney had submitted a post-hearing brief arguing that the jobs the VE stated were available no longer existed as described in the DOT (which was last updated in 1986), and that, even to the extent they did exist, the Standard Occupational Classifications ("SOC Codes"), which groups DOT jobs together based on Department of Labor data, classifies the jobs at a skill or exertional level higher than that possessed by Mr. Roberts (R. 27, 308). The ALJ stated that the VE was unable to defend her testimony against this post-hearing argument, and in any event, even without adopting the VE's testimony, a finding that Mr. Roberts is not disabled was appropriate "under the framework of the above-cited rule," apparently referring to Grid Rule 201.21 (R. 27). The ALJ's opinion did not elaborate on why this Grid rule supported a finding of no disability without regard to the VE's testimony.

### III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Mr. Roberts argues that the ALJ erred by (1) making an incorrect Step Five determination that there are jobs in the economy he can perform despite the limitations set forth in the RFC; (2) by making an improper credibility determination; and (3) by adopting an incorrect RFC (Pl. Mem. at 7). We agree with the plaintiff that the ALJ's analysis at Step Five was flawed, and thus remand the case on that basis.

**A.**

The ALJ correctly described the framework for making a Step Five determination using Grid Rule 201.21. That is, she noted that, in cases where a claimant has non-exertional (also described as environmental) limitations that "may substantially reduce the range of work an individual can perform," it is inappropriate to rely solely on the Grid and the ALJ should consult a VE. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014). In her opinion, the ALJ describes Mr. Roberts' vision loss as imposing "significant" environmental limitations, and thus she appropriately enlisted the assistance of the VE to determine whether there are jobs Mr. Roberts can perform despite his limitations (R. 25). However, the ALJ then made several serious errors in finding that Mr. Roberts was not disabled.

*First*, the ALJ did not provide the VE with the full range of Mr. Roberts' limitations that she identified in his RFC – namely, she did not ask the VE to consider a claimant who needed to avoid heights, elevated humidity, airborne pollutants such as dust, and, perhaps most significantly, moving machinery. The ALJ's failure to give the VE an accurate hypothetical is fatal, because "ALJs must provide VEs with a complete picture of a claimant's residual functional capacity." *Murphy*, 759 F.3d at 820, *citing Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011). If the hypothetical posed to the VE does not include all of a claimant's limitations, the record must show that the VE knew the extent of such limitations. *Murphy*, 759, F.3d, at

9

820. In this case, we have been pointed to no evidence in the record showing that the VE was aware of the full extent of Mr. Roberts' limitations that the ALJ later found in determining the RFC. The VE's testimony about the jobs Mr. Roberts could perform is thus not reliable.[11]

The Commissioner nonetheless argues that the ALJ's failure to provide the VE with the correct hypothetical was not fatal because "hazards such as moving mechanical parts and working in high places are considered unusual in unskilled sedentary work" (Def. Mem. in Sup. of Mot for SJ, at 4, citing SSR 96-9p). This argument is without merit. At least two of the three jobs identified by the VE as available to Mr. Roberts – polisher and table worker – do in fact appear to require the worker to regularly use moving machinery in the job.[12]

*Second*, there is an open question as to whether the jobs cited by the VE indeed exist in the current national economy. The Commissioner has the burden of producing "substantial evidence of Plaintiff's ability to perform *actual* jobs existing in significant numbers" (Pl. Mot. for SJ at 9), *citing Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984) (emphasis in original). In her opinion, the ALJ cited plaintiff's post-hearing argument that the three positions identified by the VE had not been updated in the DOT since at least 1986, and the jobs themselves either no longer existed at all or else had been reclassified as comprising a higher skill or exertion level

---

[11] Generally, when a VE testifies about available jobs that meet a claimant's vocational profile, it is up to the ALJ to ask whether such testimony conflicts with the description of those jobs in the DOT and then resolve any conflict before relying on the VE's testimony. SSR 00-4p, *Overman v. Astrue*, 546 F.3rd 456, 462-63 (7th Cir. 2008). In this case, however, such a question would not have been useful because the ALJ's hypothetical to the VE was not accurate in the first place. Therefore, the VE could not have known that her testimony about available jobs conflicted with Mr. Roberts' RFC.

[12] According to the DOT, a Table Worker "examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles" and a polisher "Polishes plastic eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Applies abrasive compound to wheel surface, using brush. Starts machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspects and feels polished parts to verify removal of flaws. Presses sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence." www.occupationalinfo.org visited on February 10, 2016. This information does not easily square with the Commissioner's statement in its brief that "[a[ccording to the DOT, the jobs of a table worker, [and] polisher . . . do not require . . . moving mechanical parts" (doc. # 17: Comm'r.'s Mem. at 5).

than Mr. Roberts' RFC (R. 27, 308). *See, Herrmann v. Colvin*, 772, F3d 1110, 1113 (7th Cir. 2014 (noting that the DOT "is an obsolete catalogue of jobs").

We need not address the merits of that contention, because the ALJ erroneously failed in the first instance to do so. The ALJ pointed out that the challenge came in a post-hearing submission, and that as a result, the VE "cannot defend her testimony" (R. 27). That observation does not provide a sound basis for the ALJ's failure to resolve the challenge to the VE's testimony. We see no reason why the ALJ could not have obtained further information from the VE (by reopening the hearing or by other means) to address this point. That is particularly so where the ALJ, in the face of the post-hearing challenge to the existence of the jobs cited by the VE, did not make an actual finding that the jobs cited by the VE indeed exist. Rather, the ALJ said that even disregarding the VE's testimony, application of the Grid rule made it appropriate to find that plaintiff is not disabled (R. 27).[13]

*Third*, the ALJ's approach led to another serious error in her determination. We are hard-pressed to understand how the ALJ came to the conclusion that Grid Rule 201.21 supported a finding that plaintiff is not disabled without regard to the VE's testimony, when earlier in the same paragraph of her opinion the ALJ recognized the need to use VE testimony because Mr. Roberts had non-exertional limitations which made reliance on the Grid rule inappropriate. The ALJ's conclusory statement that "a finding of 'not disabled' is appropriate under the framework of the above-cited rule" (R. 27) sheds no light on why such a finding is appropriate under the Grid rule without the benefit of the VE testimony, when Seventh Circuit law says otherwise. *Murphy*, 759 F.3d at 819.

---

[13]The Commissioner argues that, despite criticism of the DOT by the Seventh Circuit, ALJs still must take administrative notice of it. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). That argument misses two important points. *First*, taking notice of the DOT does not relieve an ALJ of the need to resolve challenges to its accuracy. *Johnstone v. Astrue*, 843 F.Supp.2d 962, 980 (E.D. Wisc. 2012) *Second*, the ALJ here did not rely on the accuracy of the DOT, but instead relied on the Grid rule in finding plaintiff not disabled.

11

*Fourth,* even if we accept for the moment that the three jobs suggested by the VE are both currently available and properly categorized as sedentary, the ALJ failed to explain how she concluded that Mr. Roberts' eye impairment would allow him to perform these jobs. The VE's uncontested testimony is that an individual without near visual acuity would be unable to perform at the sedentary level. Although she doesn't discuss Mr. Roberts' eye impairment or limitations in any detail in her opinion, the ALJ apparently concludes that "near visual acuity" actually means "near visual acuity in at least one eye" to justify finding that Mr. Roberts is not disabled. However, the VE was not asked, and did not state, whether near visual acuity in one eye would suffice for those jobs. We therefore cannot determine how the ALJ came to this conclusion based on the medical evidence and testimony before her and thus, we find that her conclusion that Mr. Roberts is not disabled is not supported by the record.[14]

---

[14] We recognize that the VE testified that she adjusted the number of jobs available to Mr. Roberts based on his lack of full depth perception (R. 64-65). However, depth perception is not the same thing as visual acuity. Depth perception refers to the ability, using two functioning eyes, to see in three dimensions. http://www.aao.org/eye-health/ask-eye-md-q/stereopsis, visited on February 19, 2016. By contrast, visual acuity refers to sharpness and clarity of vision, as measured by the ability to see letters or numbers at a given distance. http://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/visual-acuity?sso=y, visited on February 17, 2016. The VE's adjustment for Mr. Robert's lack of depth perception does not address whether he could perform the jobs in question with visual acuity in only one eye.

## CONCLUSION

In sum, we are presented here with a case in which the ALJ failed to provide the VE with a hypothetical that included critical limitations later found in the RFC; failed to resolve a challenge to the existence of jobs the VE cited in reliance on that incorrect hypothetical and the DOT; and issued a finding of non-disability without reliance on the VE testimony and based on the Grid rule alone, in direct contradiction of Seventh Circuit precedent. For all of these reasons, we grant Mr. Roberts' motion for reversal and remand (doc. #14), and deny the Commissioner's motion (doc. #16). This case is remanded for further proceedings consistent with this opinion. The case is terminated.[15]

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: February 22, 2016**

---

[15] As a result of this ruling, we do not address the other challenges plaintiff made to the ALJ's determination.